Marian L. Bloxom v. Commissioner. J. M. Bloxom v. Commissioner.
Bloxom v. Commissioner
Docket Nos. 16968, 16969.
United States Tax Court
1950 Tax Ct. Memo LEXIS 276; 9 T.C.M. (CCH) 104; T.C.M. (RIA) 50039; February 20, 1950
C. W. Halverson, Esq., for the petitioners. Wilford H. Payne, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion These proceedings, consolidated for hearing, involve deficiencies in income tax for 1944 for Marian L. Bloxom and for J. M. Bloxom in the amounts of $3,077.96 and $2,752.96. Of the several adjustments made in the petitioners' returns by respondent, the only one contested here by petitioners is the respondent's refusal to allow the petitioners to return profits realized on *277 the transfer of 17 shares of the capital stock of the Washington Fruit & Produce Company as long-term capital gains. The sole issue presented for our determination is whether respondent erred in determining that the shares of stock in the Washington Fruit & Produce Company were held for not more than six months and the profits realized upon them were short-term rather than long-term capital gains, as reported by the petitioners. Findings of Fact Some of the facts were stipulated and are so found. The stipulation filed is incorporated herein by reference. The petitioners are, and at all times material hereto have been, husband and wife residing in Yakima, Washington. They filed their separate income tax returns for 1944 on the community income basis with the collector of internal revenue for the district of Washington. The Washington Fruit & Produce Company was a Washington corporation with its principal place of business at Yakima, Washington. The total outstanding capital stock of the corporation was 100 shares of common stock. Prior to February 1, 1943, Fred B. Plath, the president and manager, owned 58 shares of stock: P. J. Lynch, the vice-president, owned 25 shares; *278 and T. S. Barnes, the secretary-treasurer, owned 17 shares. Barnes died on February 3, 1943. At the time of Barnes' death five of his 17 shares of stock had been endorsed in blank and were held by Plath as collateral security for a loan of $5,000 made to Barnes by Plath on June 29, 1942. After Barnes' death Plath and Lynch discussed the necessity of getting someone into the corporation to take Barnes' place in the operation of the company's business. To accomplish that purpose Plath proposed to J. M. Bloxom, referred to individually herein as the petitioner, that he come into the business. The petitioner had about 20 years of experience in the fruit business in Yakima Valley and had been assistant general manager and treasurer and a stockholder in the Perham Fruit Company for several years. The petitioner was interested in coming into the Washington Fruit & Produce Company but only with an understanding that he could acquire 50 per cent of the stock of the corporation. Plath and Lynch agreed that the petitioner should be allowed to purchase stock in the corporation, and some time in July or August of 1943 Lynch agreed orally with petitioner to sell him his 25 shares of stock at *279 the close of the corporation's fiscal year on June 30, 1944, for the book value of the shares on that date. Bloxom came into the corporation on September 1, 1943, on a salary arrangement. Some time in September 1943 Plath offered Mrs. Barnes, the widow and executrix of T. S. Barnes, $17,000 for the 17 shares of stock held in the Barnes estate. Plath told Mrs. Barnes that the stockholders needed the stock as an inducement to a capable party to come into the corporation to take Barnes' place. Plath told Mrs. Barnes that the petitioner was the party he and Lynch had in mind to take Barnes' place. Mrs. Barnes refused to sell the 17 shares of stock at the price of $17,000, but later agreed during October 1943 to sell the stock for $20,000. On November 2, 1943, Plath and Mrs. Barnes met at the office of Mrs. Barnes' attorney and Plath paid Mrs. Barnes $20,000 for the stock. At that time Mrs. Barnes paid Plath the loan of $5,000, with interest, and assigned to him in blank the 17 shares of stock in the Washington Fruit & Produce Company. Plath did not tell Mrs. Barnes at any time that he was buying the stock for anyone other than himself. Plath retained possession of the 17 shares of *280 stock purchased from Mrs. Barnes until December 30, 1943. On that date the petitioner gave Plath a check for $20,158.92, which equaled the amount Plath had paid for the stock plus 5 per cent interest from November 2 to December 30, 1943, and Plath transferred the stock certificates to the petitioner. The corporation paid no dividends to the stockholders between November 2 and December 30, 1943. The petitioner on the same day delivered the certificates to the corporation, which canceled them and issued a new stock certificate for the 17 shares in the petitioner's name. The petitioner retained this certificate of stock ownership until April 29, 1944, when it was canceled by the corporation and two new certificates were issued in lieu thereof to the petitioner and his wife for 8 1/2 shares of stock each. On February 28, 1944, the petitioner was elected treasurer of the Washington Fruit & Produce Company. He held that position continuously until the company was dissolved. On April 29, 1944, a resolution was adopted by more than two-thirds of the voting stockholders of the Washington Fruit & Produce Company for the voluntary dissolution of the corporation without benefit of court. Plath *281 was appointed liquidating trustee of the corporation. A copy of the resolution for dissolution of the corporation was filed for record in the office of the county auditor of Yakima County, Washington, on April 29, 1944. An additional copy of the resolution was forwarded on April 29, 1944, to the Secretary of the State of Washington at Olympia for filing. The Secretary of State received the resolution on May 1 and on that date informed the company that upon receipt of the required filing fee the resolution would be filed. The records of the Secretary of State show that the resolution was filed in his office for official purposes on May 4, 1944. Between April 29, 1944, and June 30, 1944, substantially all of the assets of the Washington Fruit & Produce Company were transferred by Plath, the liquidating trustee, to a partnership formed for the purpose of taking over the corporate assets and operating the business. The partnership bore the same name as the corporation and consisted of the former stockholders in the corporation, who held partnership interests in proportion to their former ownership of stock in the corporation. The partnership continued its business without interruption *282 on and after May 1, 1944, the date when the entire operating assets of the business were set up on the partnership books. The final income tax return of the corporation was filed by the liquidating trustee for the taxable peried from July 1, 1943, to April 29, 1944. The return of information pursuant to section 148 (d) of the Internal Revenue Code with respect to dissolution of a corporation was filed on June 24, 1944, with the Bureau of Internal Revenue by Plath and the petitioner. In that return the statements were made that the stockholders' resolution to dissolve the corporation was on April 29, 1944; that the assets of the corporation were distributed to the liquidating trustee on April 29, 1944; that the trustee transferred the assets to the partnership on May 1, 1944; and that April 29, 1944, was the final date included in the last income tax return of the corporation. All of the stockholders surrendered their stock to the corporation on April 29, 1944. No distribution was made to the former stockholders after April 29, 1944, except through the partnership. The first informative income tax return of the partnership was filed for the fiscal year beginning *283 May 1, 1944, and ending April 30, 1945. The same depreciable assets formerly held by the corporation were shown in the partnership return as partnership assets and depreciation was claimed upon them for the entire year beginning May 1, 1944. The individual income tax returns of the petitioners for the year 1944 showed under schedule of gains and losses from sales or exchanges of capital assets the acquisition of 17 shares of capital stock of the Washington Fruit & Produce Company in September 1943 at a cost of $20,000, the date sold as "Corp. dissolved 4/24/49," and the gross sales price as "$46,891.13 value on dissolution." The resulting capital gain to the community amounted to $26,891.13, which was returned by the petitioners for income tax purposes as long-term capital gain. Respondent determined that the petitioners held the 17 shares of stock not more than six months so that the capital gain, as adjusted by him, was subject to tax as a short-term capital gain. The petitioner, J. M. Bloxom, acquired the 17 shares of capital stock in the Washington Fruit & Produce Company on December 30, 1943, from Fred B. Plath. The petitioners held the stock in the corporation not more than *284 six months. Opinion LEMIRE, Judge: The only question presented for our determination is whether the respondent properly determined that the 17 shares of stock in the Washington Fruit & Produce Company were held by the petitioners for not more than six months and that the gain realized upon the stock is taxable in full as a short-term capital gain under the provisions of section 117 of the Internal Revenue Code. The parties disagree as to both the beginning and termination of the holding period. The prtitioners contend that the stock was purchased in October 1943 and held until the dissolution of the corporation on May 4, 1944. Respondent contends that the holding period of the stock did not begin earlier than December 30, 1943, and ended April 29, 1944, or, in any event, no later than May 4, 1944. The petitioners argue that the petitioner, J. M. Bloxom, agreed to come into the Washington Fruit & Produce Company only if he could acquire 50 per cent of the stock and that he did come into the corporation in September 1943 with the understanding that Lynch was to sell him his 25 shares of stock at the end of the corporation's fiscal year and that Plath would *285 acquire the 17 shares here in question from the Barnes estate for him. Petitioners argue that by oral agreement made between petitioner, J. M. Bloxom, and Plath about the middle of October 1943 Plath undertook to buy the Barnes stock for the petitioner, using his own money for purchasing the stock and holding the stock as collateral security until such time as the petitioner could raise the money to repay Plath. While Plath had previously negotiated with Mrs. Barnes for the stock and had told her that he and Lynch needed to get someone else into the business and they would need the stock as an inducement to a competent man, he never told Mrs. Barnes that he was buying the stock for the petitioner. The petitioner's name was mentioned in the negotiations only as a reference to the man in whom Plath and Lynch were interested as a potential associate with them in the business. Mrs. Barnes understood only that Plath was buying the stock for himself. Petitioners argue that Plath bought the shares as an agent for petitioner, J. M. Bloxom, advancing the money for the purchase on the petitioner's assurance that he would repay Plath in a short time. The petitioner did pay Plath the amount *286 which the stock had cost him, plus 5 per cent interest on the money for the period Plath held the stock, when he took the stock from Plath on December 30, 1943. Section 117 (a) (b) of the Internal Revenue Code defines and distinguishes shortand long-term capital gains as follows: "SEC. 117. CAPITAL GAINS AND LOSSES. "(a) Definitions. - As used in this chapter - "(1) Capital Assets. - The term 'capital assets' means property held by the taxpayer * * *; "(2) Short-term capital gain. - The term 'short-term capital gain' means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing net income; "(4) Long-term capital gain. - The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income; "(b) Percentage Taken Into Account. - In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital *287 gain, net capital loss, and net income: "100 per centum if the capital asset has been held for not more than 6 months; "50 per centum if the capital asset has been held for more than 6 months." To "hold" property within the meaning of section 117 of the Internal Revenue Code is to own it. "In order to own or hold one must acquire. The date of acquisition is, then, that from which to compute the duration of ownership or the length of holding." McFeely v. Commissioner, 296 U.S. 102. No one acquired the stock from Mrs. Barnes prior to November 2, 1943, when Plath paid the price agreed upon to Mrs. Barnes and received the stock certificates from her. Prior to that date of actual sale and delivery of the stock Plath and Mrs. Barnes had merely agreed upon the sale price for the stock. There is no substantial evidence that the petitioner had any right of ownership in the stock until December 30, 1943, when he paid Plath for it and took possession or control of it. The petitioner testified that he told Plath he would be willing to pay $20,000 for the stock and that he requested Plath to buy the stock for him until such time as he could pay for it *288 himself. There is no evidence of any kind that Plath agreed to accept any agency for the petitioner. Between November 2, 1943, when Plath bought the stock, and December 30, 1943, when the petitioner in turn bought it from Plath, the petitioner had at most an option or contract to buy the stock from Plath when he could. A mere option or contract to buy property is not equivalent to ownership for purposes of determining the acquisition date of property within the meaning of section 117 of the Internal Revenue Code. Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496; E. T. Weir, 10 T.C. 996, affirmed per curiam, 173 Fed. (2d) 222. The fact that petitioner paid Plath 5 per cent interest on the money used to buy the stock for the period Plath held it does not establish that Plath had loaned the money for the purchase in view of the fact that no dividends were paid upon the stock while Plath held it. He was entitled to some return on his investment during the period he held the stock if he was not to collect dividends upon it. In the companion cases of Albert E. Dyke, 6 T.C. 1134, and Ethlyn L. Armstrong, 6 T.C. 1166, *289 affirmed per curiam, 162 Fed. (2d) 199, the taxpayers had executory contracts to purchase stock, which they later purchased, paying interest upon the purchase price from the date of the purchase agreement to the date of purchase. We attributed no significance in those cases to the payment of interest on the purchase price pending actual acquisition of the stock and we do not here. We conclude, therefore, that the petitioner did not acquire the 17 shares of stock in the Washington Fruit & Produce Company before December 30, 1943. Having determined the beginning date of the holding period of the stock, we come to the question of the termination date of the period. In this case the termination of the holding period is the effective date of dissolution of the Washington Fruit & Produce Company. The Washington Fruit & Produce Company was incorporated under the laws of the State of Washington and its dissolution is controlled by the laws of that state. The corporation was voluntarily dissolved out of court by the resolution of more than two thirds of the stockholders and the appointment of a liquidating trustee under the provisions of Remington's Revised Statutes of Washington, *290 § 3803-49. [1]
*291 Respondent argues that the dissolution of the corporation took place either April 29, 1944, the date on which the resolution was adopted, or on May 1, 1944, the date on which the succeeding partnership commenced business. The petitioners argue that the dissolution of the corporation could not become effective until May 4, 1944, the date on which the resolution was officially filed in the Office of the Secretary of State, making the liquidating trustee's appointment effective. Since the petitioners argue that the trustee's appointment and the transfer of the corporation's assets in liquidation were effective on May 1, 1944, we take that date to be the latest possible effective date of dissolution of the corporation. Having concluded that the petitioners' holding period for the stock did not begin until December 30, 1943, the date when they acquired the stock, we find it unnecessary to determine the precise date when the corporation was liquidated. Petitioners would have to have held the stock until July 1, 1944, to have held it more than six months and since the corporation was dissolved in April or May of 1944, they held it at the most less than five months. We conclude that *292 respondent was correct in determining that the gain realized by petitioners upon stock in the Washington Fruit & Produce Company was a short-term capital gain, 100 per cent of which is subject to taxation within the meaning of section 117 of the Internal Revenue Code. Decision will be entered under Rule 50. Footnotes
1. § 3803-49. Voluntary dissolution, how effected. I. Voluntary proceedings for dissolution may be instituted whenever a resolution therefor is adopted by the holders of at least two-thirds of the voting power of all shareholders at a shareholders' meeting duly called for the purpose. II. The resolution may provide that the affairs of the corporation shall be wound up out of court, in which case the resolution must designate a trustee or trustees to conduct the winding up, but such appointment shall not be operative until a. duplicate copies of such resolution have been signed and acknowledged by a majority of the directors or by shareholders holding a majority of the voting power of all shareholders, and b. one of such copies has been filed for record in the office of the Secretary of State and the other copy filed in the office of the Auditor of the county in which the corporation has its registered office. III. The resolution may provide that the affairs of the corporation shall be wound up under the supervision of the court, in which case the resolution shall authorize certain directors or shareholders to sign and present a petition to the court praying that the corporation be wound up and dissolved under the supervision of the court. IV. Where a corporation is being wound up and dissolved out of court, the trustee or trustees appointed by the shareholders, or a majority of them, may by petition apply to the court to have the proceedings continued under the supervision of the court, and thereafter the proceedings shall continue as if originally instituted subject to the supervision of the court.↩